2018 IL App (2d) 160581
No. 2-16-0581
Opinion Filed December 10, 2018

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-647 |
| STEPHEN S. BONA, | ) ) ) | Honorable George J. Bakalis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices McLaren and Hutchinson concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial in the circuit court of Du Page County, defendant, Stephen S. Bona, was convicted of two counts of threatening a public official, in violation of section 12-9 of the Criminal Code of 2012 (Code) (720 ILCS 5/12-9(a) (West 2012)).  Defendant appeals his conviction, challenging (1) whether the statute is constitutional, (2) the sufficiency of the evidence presented against him, (3) the admissibility of certain evidence, and (4) allegedly improper comments during closing argument.  We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     At defendant's trial, Kathleen Murphy, a legislative assistant to State Representative Jeanne Ives, testified that on the morning of March 22, 2013, she was listening to voicemails that

came into Ives's office over the previous two days. One of the calls was from a man who "sounded like somebody was reading from a script." Murphy testified that the man compared himself and his partner and the good things they had done to Representative Ives and her husband and how "awful" they were. Murphy stated that the man called Representative Ives the "C-word." Murphy said that she deleted the voicemail due to its offensive nature, as was her standard practice. The next voicemail in succession sounded like it was from the same person. That voicemail was preserved and played for the jury:

> "Your Tea Party brethren, Sara[h] Palin, put up a map that included the names, locations, faces of Democratic candidates, and put them in the cross-hairs of a gun. Perhaps we should do the same for you. We know where you live. There is no longer an assault weapons ban. Perhaps you should think about that before you speak the next time, you stupid fucking bitch."

¶ 4 Murphy testified that she had been trained to contact the police in situations that created uncertainty or worry in her mind. She phoned the police to report the second voicemail, and then notified Representative Ives.

¶ 5 Officer Robert Krolikowski testified that he was a 23-year veteran of the Wheaton Police Department. On the morning of March 22, 2013, he responded to the call from Representative Ives's office. He spoke with Murphy, who expressed concern about the contents of the voicemail. Officer Krolikowski listened to the voicemail and made a recording of the call. He noted in his report that the previous voicemail was from a similar-sounding person and that Murphy did not characterize the first voicemail as threatening. Krolikowski later alerted his superiors about the case. He turned over the recording and the information he had gathered to the investigation division.

¶ 6    Representative Ives testified.  She began her term as the state representative for the 42nd District in January 2013.  On February 25, 2013, she appeared on a Catholic radio program called Marriage Monday that airs in the Chicago area.  A recording of the radio interview was played for the jury.  Among other topics, Representative Ives discussed the then-pending gay-marriage bill, to which she expressed her opposition:

> "They are trying to redefine marriage.  It's a completely disordered relationship.  And when you have a disordered relationship, you don't ever get order out of that.
>
> ***
>
> They're not just trying to redefine marriage; they're trying to redefine society.  They're trying to weasel their way into acceptability so they can then start to push their agenda down into the schools because this gives them some sort of legitimacy.
>
> ***
>
> To not have a mother and a father is really a disordered state for a child to grow up in, and it really makes that child an object of desire rather than the result of a matrimony [*sic*]."

Representative Ives testified that she received both positive and negative feedback about her comments.  Regarding the negative feedback, she testified: "I was getting hate mail, e-mails, phone calls, I had to shut down my Facebook page, just nasty words, nasty statements over the one minute in the radio program where I spoke about [gay marriage]."

¶ 7    According to Representative Ives, on the morning of March 22, 2013, she was in Springfield when she received a call from Murphy.  Murphy informed Representative Ives of the voicemail that had prompted her to call the police.  Representative Ives listened to the voicemail and described how she felt at the time:

"I felt threatened and I was frightened. I was—I am sitting in Springfield. My kids are at school. They walk home from school. This person, who I do not know, says he knows where I live and there is no longer an assault weapons ban and I better watch what I say. I mean, it is very frightening to know that somebody is targeting your home where your children live and I was afraid. I was just—it was—I—all I could do was make sure my kids were safe and worry about them. It was—I was afraid."

¶ 8 Officer Jason Scott testified that he was assigned to work the case after Officer Krolikowski's initial contact and report. He contacted defendant using the caller identification information Officer Krolikowski had collected at Representative Ives's office. Defendant confirmed that he had left a message for Representative Ives, but he denied making any threats. Defendant agreed to meet with Officer Scott at the Wheaton Police Department later that evening. At the police station, defendant explained that he had left two messages. He told Officer Scott that he first collected his thoughts on a computer and then called Representative Ives's number. He intended to leave only one message but was cut off from the system during his dictation. This necessitated the second call and message. He claimed that, during the calls, he indicated that he thought that Representative Ives's views were flawed and that she should repent as a Christian. Defendant explained his comment about knowing where Representative Ives lived as meaning that he knew only generally where she lived, based on a map posted on the Internet, but did not know her actual address. Officer Scott played the recording of the message for defendant, who confirmed that it was his voice on the recording. Officer Scott placed defendant under arrest at that time.

¶ 9 Defendant testified that he met his husband, Michael Bradley, on New Year's Eve, 1991. They committed to each other as a couple shortly thereafter and had been together ever since. In

June 2011, they entered into a civil union in Kane County on the same day that civil unions became legal in Illinois. They married in November 2013, following the United States Supreme Court decision that legalized gay marriage nationwide. See *Obergefell v. Hodges*, 576 U.S. ___, ___, 135 S. Ct. 2584, 2604-05 (2015).

¶ 10    Defendant testified that in March 2013 he was acutely aware of the public debate and the pending gay-marriage bill in the Illinois legislature. He kept abreast of the status of the bill by subscribing to certain news groups. During that period, he received an e-mail from one of the news groups directing him to an article in the Huffington Post. The article highlighted Representative Ives's comments from the radio interview and included a hyperlink to excerpted recordings of the interview. Defendant listened to the excerpts and then went to the radio station's website to listen to the entire interview. He testified that he felt offended by the comments. He characterized the "disordered" comment as a "dog whistle" that harkened back to a time when gay people were classified as mentally ill and put into hospitals. He said that the term "weasel" was insulting because it implied that gay people were "distrustful and unworthy" vermin. Defendant testified that he was most insulted by the comment that a child was an "object of desire" in a gay marriage.

¶ 11    Defendant testified that he never intended to harm or frighten Representative Ives. After hearing her comments, he conducted further research. He found an op-ed written by Representative Ives in the Chicago Tribune where she expressed displeasure with House Speaker Michael Madigan over the legislative process involving a concealed-carry bill. He located a second article in which Representative Ives wrote that she believed that "Second Amendment rights are a defense against tyranny." Defendant testified that he disagreed with her views on gun control and did not think that they were supported by the text of the second amendment or

historical documents. He said that he let the information "sit for a day or two" before he decided to call her and let her know what he thought.

¶ 12    On the evening of Wednesday, March 20, 2013, he organized his thoughts by typing them into a Microsoft Word document on his laptop. Once he was satisfied with the precise wording, he called Representative Ives's office, reached her voicemail system, and read the document word-for-word. Defendant testified that he talked about his 21-year relationship with Bradley and how they had been responsible citizens who paid more than their fair share of taxes. They cared for an elderly neighbor and helped other neighbors who were facing foreclosure. He said that he and Bradley had raised four German shepherds and rescued one abandoned cat. He testified that he made mention of the hatred that he and Bradley had faced as a couple, including from his own family. He said that he told Representative Ives that her comments on homosexual relationships were offensive and based in hate and ignorance. He said that he assumed that she was a Christian, because she was from Wheaton, and that there was nothing in Christ's teachings that supported her hateful speech about gay people. He said that he referenced Bill Gates's views on gay marriage. Regarding her comments on the pending concealed-carry bill and Speaker Madigan, he said that the comments were naïve and could put innocent people in danger. He said that he mentioned that he was concerned that she was targeting Speaker Madigan as a tyrant. He testified that he had started to talk about Sarah Palin's website when his phone began beeping and then went dead. A few minutes later, he called back and left the second message, which was preserved. He testified that he had no recollection of using profanity during the first call and that the "C-word" "is not one that comes out of my mouth." He testified that he did not save or print the document from which he dictated his messages.

¶ 13    The jury found defendant guilty of two counts of threatening a public official, a Class 3 felony, in violation of section 12-9 of the Code.  720 ILCS 5/12-9(a), (c) (West 2012).  The trial court denied defendant's motion for judgment notwithstanding the verdict.  It sentenced defendant to probation for a term of two years.  Defendant timely appealed.

¶ 14                                    II. ANALYSIS

¶ 15    Defendant raises four contentions in his appeal: (1) section 12-9 of the Code violates the first amendment to the United States Constitution (U.S. Const., amend. I) and the free-speech provision of the Illinois Constitution (Ill. Const. 1970, art. I, § 4), (2) the State failed to prove beyond a reasonable doubt that defendant violated section 12-9, (3) the trial court erred by permitting Representative Ives to testify that she perceived the communication as a threat, and (4) the prosecutor's improper remarks during closing argument deprived defendant of a fair trial.

¶ 16                             A. Constitutional Arguments

¶ 17    We start by considering defendant's argument that section 12-9 of the Code is unconstitutional because it violates the first amendment to the United States Constitution and the free-speech provision of the Illinois Constitution.[1]  "Statutes are presumed to be constitutional,

---

[1]    We recognize that our supreme court has directed us to decide cases on nonconstitutional grounds whenever possible and to reach constitutional issues only as a last resort.  *In re E.H.*, 224 Ill. 2d 172, 178 (2006).  Here, we examined each of defendant's nonconstitutional issues first, but we were unable to resolve the case without reaching the constitutional issue.  We present the issue involving the constitutional question first for clarity and because it is the premise for our resolution of defendant's contentions regarding sufficiency of the evidence.

and '[t]o overcome this presumption, the party challenging the statute must clearly establish that it violates the constitution.' " *People v. Plank*, 2018 IL 122202, ¶ 10 (quoting *People v. Rizzo*, 2016 IL 118599, ¶ 23). Whether a statute violates the constitution is a question of law, which we review *de novo*. *Plank*, 2018 IL 122202, ¶ 10.

¶ 18                    1. *Free-Speech Provision of the Illinois Constitution*

¶ 19    Although defendant asserts that section 12-9 violates the free-speech provision of the Illinois Constitution, his subsequent analyses focus solely on why he feels that section 12-9 violates the first amendment to the United States Constitution. He offers no argument and cites no authority as to why section 12-9 is unconstitutional under the Illinois Constitution. Thus, he has forfeited review of his claim with respect to the Illinois Constitution. *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88 (argument forfeited when the defendant failed to comply with Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2018), which requires that arguments contain cogent legal argument and citations to relevant authority); see also *People v. Hale*, 2013 IL 113140, ¶ 15 n.4 (review was confined to federal constitutional issue when no argument was made of a concomitant right under the Illinois Constitution).

¶ 20                    2. *First Amendment to the United States Constitution*

¶ 21    Defendant was convicted under section 12-9 of the Code, which states in relevant part:

> "(a) A person commits threatening a public official *** when:
>
> > (1) that person knowingly delivers or conveys, directly or indirectly, to a public official *** by any means a communication:
> >
> > > (i) containing a threat that would place the public official in reasonable apprehension of immediate or future bodily harm, ***
> > >
> > > *** and

(2) the threat was conveyed because of the performance or nonperformance of some public duty, *** or because of any other factor related to the official's public existence." 720 ILCS 5/12-9(a) (West 2012)

¶ 22    Defendant argues that section 12-9 is a content-based restriction on speech that is subject to strict scrutiny and is overbroad because it is not limited to "true threats." See *Watts v. United States*, 394 U.S. 705, 708 (1969). Moreover, he asserts, section 12-9 is not limited to "speech integrally related to criminal conduct." For all these reasons, defendant argues, section 12-9 is unconstitutional and thus void *ab initio*. The State responds that section 12-9, when accompanied with proper jury instructions, satisfies the "true threat" requirement and therefore is limited to speech outside the protections of the first amendment.

¶ 23    The first amendment commands that "Congress shall make no law *** abridging the freedom of speech." U.S. Const., amend. I. The due process clause of the fourteenth amendment imposes that same prohibition upon the states. *Gitlow v. People of New York*, 268 U.S. 652, 666 (1925). Not all speech, however, falls under the protection of the first amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). Congress and the states may proscribe certain well-defined, limited classes of speech that are not constitutionally protected, including obscenity, profanity, libel, fighting words, and speech integral to criminal conduct. *Chaplinsky*, 315 U.S. at 571-72; *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). Another class of unprotected speech is threats, so long as they are "true threats" and not mere political hyperbole. *Watts*, 394 U.S. at 707-08; see also *Virginia v. Black*, 538 U.S. 343, 359 (2003).

¶ 24    In *Black*, the United States Supreme Court considered a Virginia statute banning cross-burning done with the intent to intimidate. *Black*, 538 U.S. at 347. The statute included a provision that any cross-burning was *prima facie* evidence of the intent to intimidate. *Black*, 538

U.S. at 347-48. The question the Court faced was whether the statute required a "true threat," which would position it as a proscription on a class of speech not protected by the first amendment. See *Black*, 538 U.S. at 358-60. The Court held that Virginia was within its rights to ban cross-burning intended to intimidate but that it could not do so where all cross-burning was *prima facie* evidence of intent. *Black*, 538 U.S. at 362-65. The *prima facie* provision stripped away the "intent to intimidate" and criminalized what might otherwise be core political speech not intended to intimidate. *Black*, 538 U.S. at 365. The *prima facie* provision muddled the true-threat requirement and ensnared protected speech. See *Black*, 538 U.S. at 367. The statute was thus unconstitutional on its face. *Black*, 538 U.S. at 367. In so holding, the Court clarified the nature of "true threats":

> " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *** Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Black*, 538 U.S. at 359-60.

¶ 25    *Black* made it clear that "true threats" encompassed situations where a speaker had the "intent to threaten." *Black*, 538 U.S. at 359-60. It remained unclear, however, whether "true threats" were limited to situations where the speaker's subjective purpose was to threaten, or whether "true threats" could be shown by some other means.

¶ 26    In the wake of *Black*, the federal courts of appeals were divided as to what constituted a "true threat." In *United States v. Cassel*, 408 F.3d 622, 633 (9th Cir. 2005), the Ninth Circuit interpreted *Black* as requiring "proof that the speaker subjectively intended the speech as a

threat." Alternatively, at least eight other circuits adopted or reaffirmed some form of an objective "reasonable person"[2] standard as sufficient to prove the intent to threaten and, thus, a "true threat." *United States v. Nishnianidze*, 342 F.3d 6, 15 (3d Cir. 2003) ("A true threat is one that a reasonable recipient familiar with the context of the communication would find threatening."); *United States v. Fuller*, 387 F.3d 643, 646 (7th Cir. 2004) (adopting an objective standard whereby a communication is a "true threat" if a reasonable person would foresee that the communication would be interpreted by the target as a threat); *Porter v. Ascension Parish School Board*, 393 F.3d 608, 616 (5th Cir. 2004) ("true threat" occurs if an objectively reasonable person would interpret the speech as an expression of intent to harm, and "protected status of the threatening speech is not determined by whether the speaker had the subjective intent to carry out the threat"); *United States v. Mabie*, 663 F.3d 322, 332 (8th Cir. 2011) (stating that "*Black* Court did not hold that the speaker's subjective intent to intimidate or threaten is required" and reaffirming an objective test from the perspective of a reasonable recipient); *United States v. Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012) ("The reasonable-person standard winnows out protected speech because, instead of ignoring context, it forces jurors to examine the circumstances in which a statement is made ***."); *United States v. White*, 670 F.3d 498, 507-08 (4th Cir. 2012) (statement is a "true threat" if it meets the objective test of whether an

---

[2] Even among the circuits that employed an objective reasonable-person standard, division remained as to whether it should be applied from the vantage point of the speaker or the listener. *United States v. Clemens*, 738 F.3d 1, 10-11 (1st Cir. 2013) (discussing the disagreements among the courts of appeals and concluding that the objective-speaker test continued to be good law post-*Black*); accord *United States v. Saunders*, 166 F.3d 907, 913 n.6 (7th Cir. 1999).

ordinary reasonable recipient familiar with the context would perceive the statement as a threat); *United States v. Elonis*, 730 F.3d 321, 329-30 (3d Cir. 2013) (reaffirming an objective, reasonable-speaker test, explaining that a subjective test would fail to protect individuals from fear of violence); *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) ("This Circuit's test for whether conduct amounts to a true threat 'is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury.' "); *United States v. Martinez*, 736 F.3d 981, 988 (11th Cir. 2013) (adopting the Third Circuit's reasoning from *Elonis*, 730 F.3d 321, and holding that the government need prove only that a reasonable person would perceive the communication as a real threat).

¶ 27   In the midst of these varying post-*Black* standards, the United States Supreme Court provided clarity in *Elonis v. United States*, 575 U.S.___, 135 S. Ct. 2001 (2015).  In *Elonis* the Court analyzed 18 U.S.C. § 875(c) (2006), which made it a crime to communicate a threat in interstate commerce.  *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2004.  The defendant was charged with using Facebook posts to threaten coworkers, his soon-to-be ex-wife, state and local police, a kindergarten class, and an FBI agent.  *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2005-07.  The jury convicted the defendant under instructions providing that he could be found guilty if he communicated what a reasonable person, not the actual defendant, regarded as a threat.  *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2004.  The question for the Court was whether section 875(c) also required the defendant to be aware of the threatening nature of the communication and, if not, whether the first amendment required such a showing.  *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2004.

¶ 28   Section 875(c) was silent as to the required mental state.  *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2008-09.  The Court explained that the lack of a specified mental state did not mean that

none existed: "We therefore generally 'interpret[ ] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them.' " *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2009 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70 (1994)). In deciding which mental state a statute requires, the Court generally imposes the mental state that separates wrongful conduct from legally innocent conduct. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2010. In *Elonis*, the mental state needed not only to separate wrongful conduct from innocent activity but also to satisfy the constitutional threshold of being a "true threat." See *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2004-07.

¶ 29 The parties agreed that the defendant must have known at least that he was transmitting a communication, but the Court noted that "communicating *something* is not what makes the conduct 'wrongful.' " (Emphasis in original.) *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2011. The crucial element that made the conduct wrongful was the threatening nature of the communication. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2011. If criminal liability were to depend on whether a reasonable person perceived the communication as a threat, regardless of what the defendant had in mind, then the mental state for the crucial element would be negligence, which the Court had long been reluctant to infer. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2011.

¶ 30 Rejecting the government's argument for a negligence standard, the Court reached back to *Hamling v. United States*, 418 U.S. 87 (1974), where the defendants were convicted under a statute that forbade the mailing of obscene materials. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2011-12. In *Hamling*, the Court held that criminal liability could be found if " 'a defendant had knowledge of the contents of the materials he distributed, and *** knew the character and nature of the materials.' " *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012 (quoting *Hamling*, 418 U.S. at 123). A defendant would know the character of the materials if he knew that they were not

innocent but a " 'calculated purveyance of filth.' " (Emphasis omitted.) *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012 (quoting *Hamling*, 418 U.S. at 122). In *Elonis*, the "calculated purveyance" of a threat would require that the defendant knew the character of the communication as threatening. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012. Consequently, the Court held that the statute's mental-state requirement would be satisfied if the defendant transmitted a communication "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012.[3]

¶ 31 This holding was consistent with the Ninth Circuit's specific-intent interpretation of *Black*, but it also articulated a second path to proving a "true threat": knowledge of the character of the communication. The Court rejected the alternative "reasonable person" approaches employed by many of the federal courts of appeals: "Our holding makes clear that negligence is not sufficient to support a conviction under Section 875(c), contrary to the view of the nine Courts of Appeals." *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2013.

¶ 32 Although the Court did not explicitly announce that its holding also applies as a minimum standard for a "true threat," it would be illogical to conclude otherwise. The Court was tasked with interpreting the *mens rea* requirement of a federal statute that criminalizes a communication if it is a threat, knowing that the threat must be a "true threat" to steer clear of the protections of the first amendment. See *Watts*, 394 U.S. at 708; *Black*, 538 U.S. at 359-60. Thus, the mental state applied to section 875(c) must have met at least the minimum

---

[3] The Court left open the possibility, but declined to rule, that recklessness would also satisfy the mental-state requirement under the facts of the case. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012-13.

requirements of a "true threat."  If not, it would have been subject to the constraints of the first amendment, and the Court would have had to address that topic.

¶ 33    Illinois courts have had limited opportunity to interpret "true threats" in light of *Elonis*.[4] In *People v. Khan*, 2018 IL App (2d) 160724, ¶ 36, we analyzed the constitutionality of the disorderly conduct statute (720 ILCS 5/26-1(a)(3.5) (West 2012)) and determined that *Elonis* held that a "true threat" could be supported by the mental state of "intent or knowledge."

¶ 34    *People v. Dye*, 2015 IL App (4th) 130799, was decided only two months after *Elonis* was released.  In *Dye*, the court relied on reasoning similar to that of the Ninth Circuit in *Cassel*, holding that under *Black* a "true threat" required intent, not merely knowledge.  Compare *Dye*, 2015 IL App (4th) 130799, ¶¶ 9-10 (first amendment permits criminalizing only threats that are "true threats," and "true threats" require intentionality), with *Cassel*, 408 F.3d at 632-33 (threats are unprotected by the first amendment only if they are "true threats," where the speaker subjectively intended the speech as a threat).  Thus, in construing section 12-9 "within the confines of the first amendment," the *Dye* court interpreted it as "requiring intentionality."  *Dye*, 2015 IL App (4th) 130799, ¶ 10.  The court cited a single paragraph from *Elonis* but did not discuss it in detail, noting only that the "reasonable person" standard was not sufficient to establish a "true threat."  *Dye*, 2015 IL App (4th) 130799, ¶ 10.

¶ 35    In *People v. Wood*, 2017 IL App (1st) 143135, the court quoted language from *Black* and followed *Dye*'s holding that section 12-9 requires intentionality.  *Wood*, 2017 IL App (1st) 143135, ¶ 13. The *Wood* court restated the holding from *Elonis*: "[S]tatutes criminalizing speech

_____

[4] In addition to the three cases discussed here, our supreme court considered *Elonis* in *People v. Relerford*, 2017 IL 121094, ¶¶ 20-22, but made no comment, under the facts of that case, about how *Elonis* might have affected a "true threat" analysis.

for being threatening require proof that the speaker intends the communication to be a threat and that a reasonable listener would understand the communication to be threatening." *Wood*, 2017 IL App (1st) 143135, ¶ 13. We disagree with the court's restatement of the holding from *Elonis*. As explained above, the *Elonis* holding requires that the speaker (1) intends the communication as a threat *or* (2) knows that it will be viewed as a threat. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012.

¶ 36   Applying these principles to section 12-9 of the Code, we conclude that the statute is constitutional. The elements of the crime are that (1) the defendant knowingly communicated a threat to a public official, (2) the threat would place the public official in reasonable apprehension of harm, and (3) the threat was related to the performance or nonperformance of the public official's duties. The prescribed mental state for the offense as a whole is "knowingly" (720 ILCS 5/4-5 (West 2012)), which must be applied to each element of the offense. 720 ILCS 5/4-3 (West 2012) ("If the statute defining an offense prescribed a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to each such element."). The threshold question is whether, by applying the mental state of "knowingly" to each element of the offense, the statute proscribes only "true threats," which are outside the protections of the first amendment and eligible for proscription by our legislature. We hold that the "threat" in section 12-9 must be a "true threat." As discussed above, the "true threat" requirement is satisfied if the defendant transmits the communication (1) with intent to issue a threat or (2) with knowledge that it will be viewed as a threat. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012. Here, section 12-9 clearly requires that the defendant know that he is delivering a "true threat." Accordingly, the statute is not constrained by the first amendment and is constitutional on its face.

¶ 37 Any doubt that section 12-9 was applied constitutionally in the present case was eliminated by the jury instructions. The trial court recognized that *Dye* held that a "true threat" requires intentionality. It approved a modified version of the Illinois pattern jury instruction that defines the offense (Illinois Pattern Jury Instructions, Criminal, No. 11.49 (approved May 2, 2014)), replacing the words "containing a threat" with "which he intends as a true threat." The modified instruction read as follows:

> "A person commits the offense of threatening a public official (bodily harm/conveyed because of hostility) when he knowingly delivers or conveys, directly or indirectly, to a public official by any means a communication *which he intends as a true threat* which would place the public official in reasonable apprehension of immediate or future bodily harm and the person conveys the *true threat* because of the hostility of the person making the threat toward the status or position of the public official." (Emphases added.)

The trial court supplemented this instruction with a nonpattern instruction on the definition of a "true threat:"

> "A true threat occurs where a speaker directs a threat to a person or group of persons with the intent of placing the victim, or a member of his or her immediate family, in fear of bodily harm, destruction of property or death. The speaker need not actually intend to carry out the threat."

See *Black*, 538 U.S. at 359-60; *Dye*, 2015 IL App (4th) 130799, ¶ 9. By relying on *Dye*, the trial court ensured that the jury, in order to convict defendant under section 12-9, had to find that the communication was a "true threat," by which he intended to place the victim in reasonable apprehension of harm. The instructions were consistent with the first prong of the holding in

*Elonis*, that "the defendant transmits a communication for the purpose of issuing a threat." *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012. Because *Dye* limited a "true threat" to one with intentionality, the trial court had no reason to include the second prong of the holding in *Elonis*, that the defendant acted "with knowledge that the communication will be viewed as a threat." *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012. By requiring that the jury convict only if it found that defendant actually intended to communicate a threat, without giving it the option to convict if it found only that he knew that the message would be viewed as a threat, the trial court afforded defendant greater protection than he was entitled to under the constitution. Consequently, section 12-9 is constitutional on its face and it was applied here in a constitutional manner.

¶ 38 Defendant's argument that the statute is a content-based limitation on speech, and therefore subject to strict scrutiny, is misplaced. As stated, "true threats" is a well-defined class of speech that falls outside the protections of the first amendment. *Chaplinsky*, 315 U.S. at 571-72. Having held that the statute requires a "true threat," it is of no consequence that the statute is a content-based restriction on speech, because this class of speech is not protected by the first amendment. A constitutional strict-scrutiny analysis is therefore not required.

¶ 39 Likewise, defendant's arguments that the statute is unconstitutional because it is not limited to "true threats" and is thus overbroad are incorrect. A defendant must knowingly transmit a "true threat" to be convicted under the statute, which necessarily confines its application to speech not protected by the first amendment. See *Grayned v. City of Rockford*, 408 U.S. 104, 114-15 (1972) (for determining whether a statute is overbroad, "[t]he crucial question *** is whether the [statute] sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments"). Section 12-9 does not sweep protected speech

within its prohibitions, because it regulates only "true threats," which are not protected. Additionally, because we have held that the statute regulates only "true threats," which are unprotected, there is no need for us to address defendant's argument that it does not regulate "speech integrally related to criminal conduct."

¶ 40                                B. Sufficiency of the Evidence

¶ 41    Defendant next argues that, even if section 12-9 is constitutional, the State failed to prove him guilty beyond a reasonable doubt, because "there was no evidence that [defendant] intended his message to [Representative] Ives as a true threat." The State responds that the language, tone, and circumstance of defendant's communication were sufficient for a rational trier of fact to infer his intent to deliver a "true threat." When a defendant challenges the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). It is up to the trier of fact to weigh the evidence and resolve conflicts in the testimony, and we will not substitute our judgment for that of the trier of fact absent a showing that the "evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Brown*, 2013 IL 114196, ¶ 48.

¶ 42    To sustain a guilty verdict, the State had to prove the essential elements of the crime charged (*People v. Rothermel*, 88 Ill. 2d 541, 544 (1982)), which are that (1) the defendant knowingly communicated a threat to a public official, (2) the threat would place the public official in reasonable apprehension of harm, and (3) the threat was related to the performance or nonperformance of the public official's duties. 720 ILCS 5/12-9(a) (West 2012). Defendant challenges only the first element, that he knowingly communicated a threat.

¶ 43    As discussed, the jury was instructed that the threat had to be a "true threat," which could be proved by showing that (1) defendant's intent was to threaten or (2) he knew that the communication would be viewed as a threat. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012. (As noted, however, the jury was instructed only on the first prong.)  Defendant argues that he did not intend to threaten Representative Ives and that the evidence did not show otherwise.  He testified that the purpose behind his communication was to express disagreement with Representative Ives's political positions, not to threaten.  He argues that his testimony went "unrebutted" or "without significant contradiction" and that the jury was not entitled to ignore his testimony.  *People v. Jordan*, 4 Ill. 2d 155, 162-63 (1954).

¶ 44    He asserts that the only logical conclusion that could be drawn from his statements about putting people in the crosshairs of a gun and that "perhaps we should do the same for you" was that it was a conditional threat to create a website.  He explains that he disagreed with Representative Ives's position on the second amendment and was disturbed after reading an article she wrote that read in part:

> "I believe Second Amendment rights are a defense against tyranny.  They prevent the government from holding more power than the people it serves.  I believe law-abiding citizens, with proper training, should have the right to own and carry firearms if they so choose."

In a separate op-ed that appeared in the Chicago Tribune, Representative Ives expressed displeasure with the leadership of Speaker Madigan.  She wrote:

> "Yes, it's business as usual in Illinois.  The question is how much more damage needs to be done before we stop accepting 'business as usual?'  How many more jobs do we need to lose?  How many more times should our credit be downgraded?  How many more

businesses need to close? How much more debt do we need to rack up? How many more political games have to be played on tax-payer time before we insist on something better? How much more waste and corruption do we have to endure before we demand revolution?"

From these passages, defendant maintains that it was reasonable for him to be concerned that Representative Ives was calling for "violent, armed revolution against Speaker Madigan" and "tyrants." He claims that he was only warning her of the consequences that might flow from her advocacy of such a revolution.

¶ 45 Defendant compares the circumstances of his statement to those in *Dye*, where the court reversed a conviction under section 12-9: "[W]e see no evidence justifying a reasonable inference that *** [the defendant] intended to convey the idea of violent retribution ***." *Dye*, 2015 IL App (4th) 130799, ¶ 12. In *Dye*, the defendant was upset with his public defender after she told him that she would have to turn over to the prosecutor evidence harmful to his case. *Dye*, 2015 IL App (4th) 130799, ¶ 3. He threatened to complain about her to the judge and accused her of working against him for the State. *Dye*, 2015 IL App (4th) 130799, ¶ 4. As he left her office through a waiting room, he repeated the words, "I'm gonna get you." When she asked if he was threatening her, he responded, "No, no, I ain't threatening you." The court focused on the word "get" and reasoned that it had many nonviolent connotations, particularly in light of the fact that the defendant specifically and in real time denied that he meant the statement as a threat. *Dye*, 2015 IL App (4th) 130799, ¶¶ 11-12.

¶ 46 *Dye* is distinguishable. Defendant here did not personally know Representative Ives and was not speaking to her face-to-face. He left a prepared statement on her voicemail system at around 11 p.m. on a weekday night, well after business hours. He used the term "we" when

referring to himself, which suggested that he was part of a larger collective. His was a calculated statement that came days after the radio interview that he claims triggered the call, not an angry and excited utterance brought about by adverse news he had just received.

¶ 47    Based on all of the evidence, we reject defendant's argument that his "unrebutted testimony" exonerates him. His second message to Representative Ives began with a reference to Sarah Palin and her map that portrayed Democratic legislators in the crosshairs of a gun. The evidence showed that, within a few months after Sarah Palin posted that map, one of those legislators, Congresswoman Gabby Giffords of Arizona, was shot in the head and that defendant was aware of the Giffords shooting when he composed his statement and left the message. A reasonable inference from his knowledge of the shooting is that he meant to communicate that a similar event might befall Representative Ives.

¶ 48    Defendant's testimony about the content of his first message differed from Murphy's. He testified that he referred to Representative Ives's "naïve and reckless" comments about a proposed concealed-carry law. He said that she was targeting Speaker Madigan and referring to him as a tyrant. Defendant claimed that he composed the lengthy statement in a document on his laptop, but he was unable to corroborate his testimony about the call because he had deleted the document. Not only was defendant's testimony not corroborated, it was directly refuted. Murphy testified that the content of the first call "was just personal" and that she deleted the message because the speaker called Representative Ives the "C-word," a word that defendant testified that he had no recollection of using, despite remembering copious amounts of other details about the call. According to Murphy, there was nothing in the first message about Speaker Madigan or the second amendment. The jury heard all of this testimony. It was in the

best position to observe the verbal and nonverbal cues and assign weight to each. It was within the province of the jury to credit Murphy's testimony over defendant's.

¶ 49    It appears from the record that defendant was unaware of the existence of the recording of his second message until the conclusion of his interview with Officer Scott. Officer Scott testified that he asked defendant about the contents of that call and defendant described it as:

>    "We know where you live and maybe we should construct the same website, too, and, remember, the assault weapons ban has been lifted."

Compare those words to defendant's actual message, which was memorialized in the recording:

>    "Your Tea Party brethren, Sara[h] Palin, put up a map that included the names, locations, faces of Democratic candidates, and put them in the cross-hairs of a gun. Perhaps we should do the same for you. We know where you live. There is no longer an assault weapons ban. Perhaps you should think about that before you speak the next time, you stupid fucking bitch."

The account defendant gave to the police was less menacing than his actual message. A reasonable inference from the difference is that he understood that what he said was threatening and, when faced with a police investigation, he attempted to mitigate the content of his message.

¶ 50    Defendant explained that Representative Ives was trying to incite an armed revolution and that he was trying only to make her aware of the effects of those words. He repeatedly used the collective pronoun "we" during the message, suggesting that he was part of some larger group. It is difficult to envisage a legitimate purpose for such language if he was trying only to express his personal opposition to her political views. He followed the "cross-hairs of a gun" comment immediately with "we know where you live" and "there is no longer an assault weapons ban." He testified that when he delivered the message he knew that Giffords had been

shot and severely injured. His claim that his testimony went unrebutted is contradicted by the record. Based on the evidence, it was certainly reasonable for the jury to conclude that defendant's explanation was strained and that he intended to threaten Representative Ives.

¶ 51                                C. Admissibility of Evidence

¶ 52    Defendant claims that the trial court erred by permitting Representative Ives to testify to her reaction to the message. Defendant argues that her subjective feelings of apprehension were not an element of the offense and were therefore irrelevant and highly prejudicial. Quoting *Watts*, 394 U.S. at 708, the State responds that "the reaction of the listeners" is relevant to determining whether the communication was a "threat." The admissibility of evidence is within the sound discretion of the trial court, and we will not disturb such a ruling absent an abuse of discretion. *People v. Adkins*, 239 Ill. 2d 1, 23 (2010). "A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court." *People v. Axtell*, 2017 IL App (2d) 150518, ¶ 90.

¶ 53    Defendant argues that Representative Ives's testimony about her subjective apprehension of harm was irrelevant because section 12-9 requires only that a public official would be placed in "reasonable apprehension of immediate or future bodily harm." 720 ILCS 5/12-9(a)(1)(i) (West 2012). Defendant appears to argue that the term "reasonable" refers only to an objective test of how a fictional reasonable person would view the communication, rather than to whether the actual target of the communication reasonably viewed it as a threat. Defendant offers no authority to support this contention. Illinois Rule of Evidence 401 defines relevant evidence as evidence that has *any* tendency to make the existence of *any* fact in controversy more or less probable. Ill. R. Evid. 401 (eff. Jan. 1, 2011). "Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable." (Internal

quotation marks omitted.) *People v. Free*, 94 Ill. 2d 378, 413 (1983). Representative Ives's testimony about how she felt after hearing the message was relevant to whether she would be placed in "reasonable apprehension of immediate or future bodily harm." It was particularly relevant here because "reasonable apprehension" is an element of the offense and it was for the jury to decide whether Representative Ives's apprehension was reasonable.

¶ 54 Defendant next argues that Representative Ives's testimony was "extremely prejudicial" because it tended to show the impact of the crime on the alleged victim during the guilt phase of the trial. Defendant cites, without any elaboration, three cases that are inapposite. *People v. Hope*, 116 Ill. 2d 265, 276-78 (1986) (prosecutor's uninvited comments about a murdered victim's family were an improper appeal to the emotions of the jurors); *People v. Blue*, 189 Ill. 2d 99, 130 (2000) (prosecutor's argument that a murdered police officer's family needed to hear from the jury was patently immaterial to the defendant's guilt or innocence); *People v. Bernette*, 30 Ill. 2d 359, 371 (1964) (prosecutor's comments during closing argument about a murder's impact on the victim's family were irrelevant and highly prejudicial). None of these cases involved the victim of a crime testifying with regard to an element of the offense, which is what happened here. Representative Ives's testimony went directly to an element of the offense, and it added context that the jury could use to determine whether she would reasonably see the communication as a threat. Representative Ives's testimony was much more probative than prejudicial. "Evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect." *People v. Herrero*, 324 Ill. App. 3d 876, 881 (2001). The trial court did not abuse its discretion by permitting the testimony.

¶ 55 D. Prosecutor's Comments During Closing Argument

¶ 56    We turn now to defendant's claims that comments the prosecutor made during his closing argument deprived defendant of a fair trial. He argues that the prosecutor improperly argued that (1) the jury could ignore the context of defendant's communication, (2) a threat is not protected by the first amendment, (3) "no one should have to endure what Jeanne Ives endured that day," (4) it was not for the jury to consider whether defendant had a gun in his house, (5) defendant admitted during cross-examination that his message would invoke images of the Giffords shooting, and (6) a threat could be inferred because other witnesses reacted as if the communication were a threat.

¶ 57    Prosecutors are granted wide latitude in delivering closing arguments. *People v. Perry*, 224 Ill. 2d 312, 347 (2007). They may comment "on the evidence and on any fair and reasonable inference[s]" that can be derived from that evidence. *Perry*, 224 Ill. 2d at 347. When reviewing for error, we look at the argument as a whole, rather than focusing only on select phrases or remarks. *Perry*, 224 Ill. 2d at 347. Improper remarks during closing argument do not warrant reversal unless they substantially prejudice the defendant. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. We recognize that our supreme court has employed both the *de novo* and the abuse-of-discretion standards in reviewing comments during closing arguments. See *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) (*de novo*); *Blue*, 189 Ill. 2d at 128 (abuse of discretion). It is unnecessary for us to determine which standard is proper in this case, as the result would be the same under either standard.

¶ 58    Defendant first argues that the prosecutor misstated the law by arguing that the jury could ignore the context of the entire message: "Folks, if any part of that message is a threat, it's a threat. What you heard was a threat. It doesn't matter what the first part of it was." Defendant argues that his intent determined whether the communication was a "true threat" and that the

prosecutor's comment asked the jury to ignore context from which they could ascertain his intent. We disagree. The prosecutor was properly arguing that the jury should focus on the threat and not weigh the nonpreserved part of the message too heavily. The trial court properly overruled the objection, as this was not error.

¶ 59 Defendant next claims that the prosecutor was trying to confuse the jury by telling them that a threat is not protected by the first amendment: "If this is a threat, and it is a threat, it is not protected by the First Amendment." Defendant argues that only a "true threat" is not protected and that it was improper to tell the jury that a mere "threat" is not protected. The prosecutor was not misleading the jury. The term "threat" is used in the statute. Moreover, he used the term "true threat" 13 times during his closing argument and thoroughly explained that the jury needed to find that the communication was a "true threat." The court gave verbal and written instructions that the threat must be found to have been a "true threat" and supplemented those instructions with a definition of "true threat." This comment was not improper.

¶ 60 Defendant argues that the prosecutor invited the jury to convict based on its anger at the suffering of the victim rather than on the evidence: "Ladies and gentlemen, no one should have to endure what Jeanne Ives endured that day." Defendant claims that it was improper to showcase the impact of the crime on Representative Ives. As noted above, the victim's reasonable apprehension of the threat was an element of the offense charged. It was not improper to argue an element of the crime.

¶ 61 The prosecutor also attacked the relevancy of whether defendant actually possessed the means to carry out the threat: "So all that testimony from [defendant] about we don't have guns in the house, I wasn't going to actually go there and do anything to her. That's not for you to consider." The trial court sustained defendant's objection and added: "They can consider all the

evidence they've heard." The prosecutor's statement might have been improper as to its instruction that the jury should not consider a portion of the evidence, but it did not affect the verdict. Generally, sustaining an objection and instructing the jury to disregard the remark are sufficient to cure any prejudice. *People v. Ramsey*, 239 Ill. 2d 342, 438 (2010). In any event, the offense charged required that the prosecution demonstrate only that a threat was made, not that defendant actually intended to carry out the threat, and any argument attacking the relevancy of defendant's ability to follow through on the threat was not improper. To the extent that a portion of this comment was improper, it did not substantially prejudice defendant and does not warrant reversal.

¶ 62 The prosecutor also characterized part of defendant's testimony as follows: "And you heard on cross-examination *** that he knew that the Sarah Palin article was going to invoke images of Gabby Giffords." Defendant's objection as to the accuracy of that statement was sustained. Defendant admitted during cross-examination that he was aware of the Giffords shooting when he delivered his message, but he did not testify that he knew that the article would invoke images of the shooting. The prosecutor thus gave an inaccurate restatement of defendant's testimony, which was improper. But the court sustained the prompt objection, and the misstatement was immediately corrected. In light of the sustained objection, along with the trial court's instruction that the jury should disregard any statements made during closing argument that were not based on the evidence (Illinois Pattern Jury Instructions, Criminal, No. 1.03 (4th ed. 2000)), defendant was not substantially prejudiced by this remark and it does not warrant reversal.

¶ 63 Defendant lastly claims that the prosecutor improperly argued that defendant's message could be considered a threat from the reactions of Murphy and the police. For example, Murphy

phoned the police after hearing the message and the police followed up by contacting defendant. Defendant did not object to this comment at trial and thus forfeited the issue. *Burman*, 2013 IL App (2d) 110807, ¶ 32 ("To preserve an issue for review on appeal, a defendant must object to the error at trial and include the objection in a posttrial motion."). Defendant states that this issue should nonetheless be reviewed under the plain-error doctrine, but he makes no cogent legal argument as to why plain error should apply. Forfeiture aside, the prosecutor's comments were not improper. He described the actions that the witnesses testified to taking after hearing the message. He suggested that the jury could logically infer that those witnesses would not have taken those actions unless they believed that the message contained a threat. As discussed, the victim's reasonable apprehension of a threat is an element of the offense. See *Free*, 94 Ill. 2d at 413. These witnesses' reactions helped to form the context of the message and whether Representative Ives reasonably apprehended harm. Therefore, the comments were not error.

¶ 64                          III. CONCLUSION

¶ 65     For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 66     Affirmed.