NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 170818-U

NO. 4-17-0818

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 15, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| SIOBHAN HACKETT, | ) | No. 17CF374 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas M. O'Shaughnessy, |
| | ) | Judge Presiding. |

---

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Steigmann and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, concluding the State presented sufficient evidence to prove defendant guilty of threatening a public official beyond a reasonable doubt.

¶ 2     Following a bench trial, defendant, Siobhan Hackett, was convicted of threatening a public official (720 ILCS 5/12-9 (West 2016)) and sentenced to a two-year term of probation. Defendant appeals, arguing the State failed to prove her guilty beyond a reasonable doubt. We affirm.

¶ 3                              I. BACKGROUND

¶ 4                              A. The Charge

¶ 5     The State charged defendant with threatening a public official (720 ILCS 5/12-9 (West 2016)), alleging that on May 24, 2017, she indirectly communicated a threat to a Danville

police officer—through an employee of the Housing Authority of the City of Danville (HACD)—that was related to the officer's public status and would place him in reasonable apprehension of immediate or future bodily harm.

¶ 6                                    B. Bench Trial

¶ 7        Philip Coon and Doug Miller testified for the State at defendant's bench trial. After the court denied her motion for a directed verdict, defendant also testified.

¶ 8                                 1. *Evidence Presented*

¶ 9                        a. Defendant, Doug Miller, and Philip Coon

¶ 10        Defendant testified that she lived in public housing in the Fair Oaks Housing Complex (Fair Oaks), which was owned and operated by HACD. As a condition of her subsidized housing, defendant had to abide by the terms of her lease. Defendant testified that HACD could initiate eviction proceedings if a tenant was issued a certain number or type of lease violation tickets.

¶ 11        Doug Miller, a Danville police officer, testified that HACD contracted with the Danville Police Department (DPD) to enforce their leases. Miller further testified that he served as "the direct liaison between [HACD] and the police department." Miller was one of three officers on DPD's Problem-Oriented Policing Unit (POP Unit). The POP Unit was assigned to work with HACD and empowered to issue lease violation tickets on HACD's behalf. Miller testified that he spent half of each shift in the Fair Oaks area, received daily emails "from the administration there," and met weekly "with the asset manager, property manager[,] and the executive director."

¶ 12        Philip Coon testified he was an "asset manager" with HACD and his office was located in Fair Oaks. Coon's duties as an asset manager required him to "deal with rent,

evictions, any tenant issues ***." Coon stated he met with the POP Unit "at least once a month" and received biweekly reports and copies of lease violation tickets issued by the POP Unit. Coon testified that prior to May 2017, defendant had received multiple lease violation tickets from police officers, including for "having an unapproved pet" in her apartment, "obstructing a peace officer," and "having a barred individual."

¶ 13                                    b. Execution of the Search Warrant

¶ 14          On May 19, 2017, Danville police officers, including Miller, executed a search warrant at defendant's apartment. Miller testified that prior to the warrant's execution, the officers were briefed on, in part, the people who likely lived or spent a significant amount of time at defendant's apartment. Miller testified those people included defendant's boyfriend, Reginald Watts, her son, Javon Hackett, and her nephew, Aaron Moss. Miller further testified Watts had a felony firearm conviction, Javon "had a prior firearms case," and Moss had "been mentioned in several police reports taken by [DPD] regarding shootings or firearms."

¶ 15          Miller testified that before 8:30 a.m. on May 19, 2017, "10 to 12 officers" arrived at defendant's front door with "a knock-and-announce search warrant." Defendant stated she was awoken by the banging on her door and officers shouting "Danville police." Defendant was naked and "started hollering" that she was coming to the door to let in the officers. However, defendant testified that before she could open the door, the officers, who were armed and wearing "camouflage uniforms with helmet, like, gear[,]" forced entry into defendant's apartment by breaking her door down with "a ram." Defendant said the officers told her to sit on the floor in her room and ordered Watts to lay face down on the floor. According to defendant, the officers did not allow defendant to put on clothes until "after they searched the bathroom, and

they had my son and his girlfriend go downstairs and then they searched they room[,]" which lasted "about ten minutes."

¶ 16    Miller testified marijuana and a firearm were recovered during the search. Defendant stated that after the search, everyone in the apartment was detained at the police station for approximately one hour. Defendant further testified that Miller gave her a lease violation ticket for possession of a firearm before she was released from police custody. Coon testified that he received a report of the search that indicated a firearm was recovered. The report also indicated that a barred individual, Watts, and an unapproved pet were located in the apartment. Based on the report, Coon initiated eviction proceedings.

¶ 17                    c. The Alleged Threat

¶ 18    Coon testified that at approximately 10 a.m. on May 24, 2017, he went to defendant's apartment to serve her with an eviction notice. Then, according to Coon, "a good hour later[,]" defendant went to Coon's office to schedule an informal hearing with HACD's executive director to contest her eviction. Coon testified that the following occurred during his interaction with defendant:

> "While I was typing the informal hearing notice, that's when she
> was just talking about the eviction. She was visibly upset, pacing
> around, and then she was just saying different things that kind of
> alerted my attention, you know. Specifically she said, you know,
> this is—you know, this is little Danville, it's not Chicago. You
> know, how would Sergeant Miller like if I kicked down his doors
> and put a gun in his wife and kids' mouths? You know, if any

- 4 -

police officer was in Chicago, you know, they better hope they don't go to Chicago or something may happen."

After defendant left, Coon, who was "alarmed" by defendant's statements, sent an email to the executive director about the interaction and copied Miller on the email. The email was admitted into evidence without objection and set forth the following:

"[Defendant] came into the office a few minutes ago. Her and I are going to do an informal grievance hearing tomorrow at 10:00am [*sic*]. She was not very pleasant, she basically was dishing out threats towards Sgt. Miller and Danville Police. [Defendant]: 'Cops better watch out, my family will bust down Miller's doors and put a pistol in his wife and kids['] mouths. He better not be going to Chicago any time soon.' She stated she has a lawyer and [is] supposedly filing a complaint with police department today."

¶ 19   Defendant denied threatening Miller. Defendant testified that she instead stated: "[H]ow would they like it if someone did them like that while they in the house naked and someone come in they house with they kids and they had guns to they head while they in the house butt naked."

¶ 20   2. *Verdict*

¶ 21   The trial court found that the State proved defendant guilty beyond a reasonable doubt.

¶ 22   C. Posttrial Motion and Sentence

¶ 23    Defendant filed a motion for a judgment of acquittal, arguing that (1) she did not intend to make a threat but "was simply expressing frustration at the fact that Danville Police had busted down her door, held her naked at gunpoint, arrested her and all of her family members, failed to charge anyone with a criminal offense, and then had her evicted from her apartment" and (2) "it [was] not reasonable to assume that an employee of an apartment complex would relay to officers the frustrated statements of someone to whom he just gave an eviction notice." The trial court denied defendant's motion and sentenced her to 24 months of probation.

¶ 24    This appeal followed.

¶ 25                                    II. ANALYSIS

¶ 26    Defendant argues that the State failed to prove her guilty of threatening a public official (720 ILCS 5/12-9 (West 2016)) beyond a reasonable doubt. Specifically, she contends the State failed to prove that she (1) made a "true threat," or, alternatively, (2) knew Coon would convey the alleged threat to Miller.

¶ 27                          A. Standard of Review and the
                        Essential Elements of the Charged Offense

¶ 28    When a defendant challenges the sufficiency of the evidence against her on appeal, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "It is not the role of the reviewing court to retry the defendant." *Id.* Instead, it is the trier of fact's responsibility "to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* We will not reverse a conviction "unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 29        Here, the State charged defendant with violating section 12-9 of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/12-9 (West 2016)), which provides, in relevant part, the following:

"(a) A person commits threatening a public official *** when:

(1) that person knowingly delivers or conveys, directly or indirectly, to a public official *** by any means a communication:

(i) containing a threat that would place the public official *** or a member of his or her immediate family in reasonable apprehension of immediate or future bodily harm ***; [and]

***

(2) the threat was conveyed because of the performance or nonperformance of some public duty ***, because of hostility of the person making the threat toward the status or position of the public official ***, or because of any other factor related to the official's public existence.

(a-5) For purposes of a threat to a sworn law enforcement officer, the threat must contain specific facts indicative of a unique threat to the person, family or property of the officer and not a generalized threat of harm."

Thus, in this case, the State had to prove that defendant (1) knowingly communicated a threat to Miller, a public official; (2) the threat would place Miller in reasonable apprehension of immediate or future bodily harm; and (3) the threat was related to Miller's public status. 720 ILCS 5/12-9 (West 2016); *People v. Bona*, 2018 IL App (2d) 160581, ¶ 36, 118 N.E.3d 1272.

¶ 30                    B. The Evidence Was Sufficient

- 7 -

¶ 31    Defendant challenges the sufficiency of the evidence only as it relates to the first element, and she does so on two alternative bases: First, she argues the State failed to prove that she made a "true threat" because she did not *intend* to make a threat. Alternatively, she argues the State failed to prove that she knowingly communicated a threat to Miller because she could not have known Coon would convey her words to Miller. We begin by determining whether the State proved defendant made a "true threat."

¶ 32                    1. *A Rational Fact-Finder Could*
                *Have Found Defendant Made a "True Threat"*

¶ 33    "If the State charges an individual with threatening a public official under section 12-9 of the Criminal Code [citation], the threat of violence must be a 'true threat,' or else the prosecution will violate the first amendment." *People v. Smith*, 2019 IL App (4th) 160641, ¶ 48. " 'True threats' encompass those statements where the speaker *means to communicate* a serious expression of an *intent* to commit an act of unlawful violence to a particular individual or group of individuals." (Emphases added.) *Virginia v. Black*, 538 U.S. 343, 360 (2003). Some appellate court decisions—including those relied on by defendant—have interpreted this language to mean that "true threats" require a specific intent to communicate a threat, as opposed to mere knowledge of the communication's threatening nature. See, *e.g.*, *People v. Dye*, 2015 IL App (4th) 130799, ¶¶ 8-10, 37 N.E.3d 465 (construing section 12-9 "within the confines of the first amendment" and interpreting it as "requiring intentionality"). Other decisions have concluded that Supreme Court precedent subsequent to *Black* has clarified that a "true threat" includes communication transmitted " 'for the purpose of issuing a threat, *or* with knowledge that the communication will be viewed as a threat.' " (Emphasis added.) *Bona*, 2018 IL App (2d) 160581, ¶ 30 (quoting *Elonis v. U.S.*, 575 U.S. 723, ___, 135 S. Ct. 2001, 2012 (2015)).

¶ 34    Recently, our supreme court adopted the view espoused in *Bona*:

"Under the guiding principles set forth in *Black* and *Elonis*, we construe the phrase 'means to communicate' as requiring that the accused be consciously aware of the threatening nature of his or her speech, and the awareness requirement can be satisfied by a statutory restriction that requires either an intentional *or* a knowing mental state. Therefore, the first amendment exception for a 'true threat' *includes situations where the speaker understands the threatening nature of his or her communication and the import of the words used*." (Emphases added.) *People v. Ashley*, 2020 IL 123989, ¶ 56.

In this case, based on the preceding language, and contrary to defendant's assertion, the State did not have to prove that she "intended to threaten Officer Miller." The State only had to prove that defendant *knowingly* communicated a threat, *i.e.*, that she "underst[ood] the threatening nature of *** her communication and the import of the words used." *Ashley*, 2020 IL 123989, ¶ 56.

¶ 35        We find the evidence was sufficient to prove defendant knowingly communicated a threat, or, put differently, made a "true threat." Viewing the evidence in the light most favorable to the State, Coon's email, which was admitted without objection, constituted sufficient evidence of a true threat. In the email, Coon quotes defendant as saying, "Cops better watch out, my family will bust down Miller's doors and put a pistol in his wife and kids['] mouths." Even if, as defendant argues, her intention was merely to vent frustration, and not to communicate a threat, a rational fact-finder could nonetheless reasonably infer that defendant understood the threatening nature of saying her family would "put a pistol in [Miller's] wife and kids['] mouths." In fact, it would be unreasonable to infer otherwise. Moreover, the threatening

nature of her communication was made clearer by the circumstances surrounding it: Miller testified that defendant's family included multiple people who had been convicted of or charged with firearm offenses and a firearm was discovered in her apartment during the execution of the search warrant. Accordingly, we conclude the evidence was sufficient to prove defendant made a "true threat." See *id.* ("[A] 'true threat' includes situations where the speaker understands the threatening nature of his or her communication and the import of the words used.").

¶ 36                              2. *A Rational Fact-Finder Could Have Found*
*Defendant Knew the Threat Would Be Conveyed to Miller*

¶ 37         Alternatively, defendant argues the State failed to prove that she knowingly communicated a threat to Miller because she could not have known Coon would convey her words to Miller.

¶ 38         When, as here, the State charges a defendant with indirectly communicating a threat under section 12-9, the State must prove the defendant knew her threat would be conveyed to its target. See *People v. Garcia*, 2015 IL App (2d) 131234, ¶ 10, 41 N.E.3d 977 ("That defendant's threats were conveyed to [a judge] is not enough to sustain defendant's conviction; the State was also obligated to prove that defendant acted knowingly, *i.e.*, with knowledge that the threats would be conveyed to [the judge]."). Section 4-5 of the Criminal Code (720 ILCS 5/4-5(b) (West 2016)) provides that a defendant acts with knowledge of the result of her conduct "when *** she is consciously aware that that result is practically certain to be caused by h[er] conduct." Thus, we must determine whether any rational fact-finder could have found that defendant was consciously aware it was a practical certainty Coon would convey her words to Miller.

¶ 39         In *Garcia*, 2015 IL App (2d) 131234, ¶ 10, the appellate court concluded that a rational fact-finder could have reasonably inferred that the defendant, Garcia, knew his threat

- 10 -

would be conveyed to its target, even though it was not communicated directly to that target. There, a trial judge had held Garcia in contempt of court after he "uttered profanities that were directed to the judge." *Id.* ¶ 2. A "court detention technician" employed by the local police department placed Garcia in custody and escorted him to the police department's booking area. *Id.* The detention technician testified that while in the booking area, Garcia said that "when he got out he was going to break the judge's *** neck, he had an AK-47, he had other weapons, he was going to f*** up Aurora police officers." *Id.* The detention technician reported the incident to a police officer, and the police officer then reported the threat to the judge. *Id.* ¶ 5. Garcia was convicted by a jury of threatening a public official (720 ILCS 5/12-9 (West 2012)). *Id.* ¶ 1.

¶ 40       On appeal, Garcia argued that the evidence was insufficient to prove he knowingly communicated a threat because he did not know the threat—which was communicated to a court detention technician—would be conveyed to the judge. *Id.* ¶ 10. Garcia highlighted the fact that the State presented no evidence he had asked anyone to convey the threat to the judge. *Id.* The appellate court rejected this argument, explaining that the lack of a request to convey the threat "does not preclude the possibility of circumstances existing that would nearly guarantee that the threat would be conveyed to the target." *Id.* The court concluded the evidence was sufficient to prove Garcia knowingly communicated a threat, finding "the jury could reasonably infer that it was a practical certainty that threats against a judge, made in the presence of personnel of law-enforcement agencies, would be brought to the judge's attention." *Id.* The court added that the jury could also reasonably conclude Garcia "was not so uncommonly naïve as to believe otherwise." *Id.*

¶ 41 Here, defendant maintains she could not have known her statements—which were communicated to Coon, an HACD employee—would be conveyed to Miller, a police officer. However, given the close working relationship between Miller and HACD, we disagree.

¶ 42 Miller testified that DPD was contracted by HACD "to enforce *** Housing Authority rules." Specifically, the POP Unit, of which Miller was one of three members, was assigned to work with HACD. Miller served as "the direct liaison between [HACD] and the police department." He testified that he spent half of each shift in the Fair Oaks area, received daily emails "from the administration there," met weekly "with the asset manager, property manager[,] and the executive director[,]" and possessed the authority to issue lease violation tickets on HACD's behalf. Importantly, it would also be reasonable to infer from the evidence that defendant was consciously aware of this close working relationship. Defendant testified she had received numerous lease violation tickets from police officers, as opposed to HACD personnel, prior to the date in question, including one from Miller after police found a firearm in her apartment. Additionally, defendant had previously spoken to Miller on the phone on multiple occasions to complain that "all of the other officer was [*sic*] giving me reports to get me put out, and then the reports were bogus." Thus, one could reasonably infer defendant knew Miller frequently worked as an agent of HACD to enforce HACD's rules and interacted regularly with its employees.

¶ 43 As in *Garcia*, we believe a rational fact-finder could reasonably infer from the evidence above that defendant was consciously aware it was a practical certainty that a threat against a police officer who served as "the direct liaison between [HACD] and the police department," and which was made in the presence of a HACD employee who regularly met with the officer, would be brought to the officer's attention. See *id.* Accordingly, after viewing the

evidence in the light most favorable to the State, we conclude the evidence was sufficient to prove defendant knowingly communicated a threat to a public official.

¶ 44                                    III. CONCLUSION

¶ 45            For the reasons stated, we affirm the trial court's judgment.

¶ 46            Affirmed.