Filed 3/27/23 P. v. Nixon CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094488 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE014370) |
| v. | |
| BRANDON ANDRE KEITH NIXON, | |
| Defendant and Appellant. | |

A jury convicted defendant Brandon Andre Keith Nixon of making a criminal threat against the life of Officer Patrick Scott of the Elk Grove Police Department. The threat itself was conveyed in a Facebook post that included a photograph of Officer Scott and another officer with crosshairs over their faces.[1] The photograph was accompanied

---

[1] Merriam-Webster defines "crosshair" to mean "a fine wire or thread in the focus of the eyepiece of an optical instrument used as a reference line in the field or for marking the instrumental axis." (Merriam-Webster's Unabridged Dict. Online (2023) <https://unabridged.merriam-webster.com/collegiate/crosshair, par.1> [as of Mar. 20,

by the words: "Fuck both of these bitch ass cops and the Elk Grove Police Department. I hope both of you scum bags are killed in the line of duty and your family members are BRUTALLY murdered." Based on this post, as well as the surrounding circumstances, and additional evidence relevant to defendant's intent, the jury concluded the elements of Penal Code section 422 were satisfied.[2] Defendant was sentenced to the upper term sentence of three years in state prison for this crime.

On appeal, defendant contends: (1) the evidence is insufficient to support this criminal threats conviction because there was no evidence that defendant intended for Officer Scott to see the Facebook post and, as a matter of law, the words used in the post did not constitute a punishable threat; (2) the trial court prejudicially abused its discretion and violated defendant's federal constitutional rights by admitting evidence of prior threats; (3) the trial court prejudicially erred and also violated defendant's constitutional rights by failing to instruct the jury on causation; (4) the cumulative prejudicial effect of the foregoing assertions of error requires reversal; and (5) recent ameliorative changes to the sentencing laws apply retroactively to this case and require remand for a new sentencing hearing.

We conclude defendant's criminal threats conviction is supported by substantial evidence and does not amount to an infringement of defendant's First Amendment right to free speech. We also conclude the trial court did not abuse its discretion or violate defendant's constitutional rights by admitting evidence of certain prior threats made by defendant. Nor was there any prejudicial instructional error or cumulative prejudice requiring reversal. We shall therefore affirm defendant's conviction. However, as the

---

2023], archived at: <https://perma.cc/QS4C-3HM9>.) As defendant admitted, "[i]t's what you see in the scope of a rifle."

[2] Undesignated statutory references are to the Penal Code.

2

Attorney General concedes, we must vacate defendant's sentence and remand the matter for a new sentencing hearing.[3]

## BACKGROUND

While the Facebook post at issue in this case was posted in July 2019, we begin our summary of the background facts with a different Facebook post, from about two years earlier. We do so because this earlier post, and defendant's subsequent conduct, informed how law enforcement reacted to the July 2019 post.

In May 2017, defendant posted a picture of Cosumnes Oaks High School, accompanied by a diatribe about the school. Defendant began the post by saying that he graduated from the school five years earlier and calling his time there "the worst nightmare that lasted four miserable years with lasting bitterness and regret that won't soon be left behind." Defendant complained of "bullying" and "incompetent faculty," and then derided the School Resource Officer, Deputy Patrick Gallagher, calling him "a skinhead lookin ass . . . pig." Defendant accused the school of "harbor[ing] terrorists" and accused Deputy Gallagher of being "the ring leader." The post concluded: "I would NEVER shed a tear or mourn should the day come a tragic incident happens at the school. Rather I'd commend anyone who would unleash their wrath on those school grounds, console and comfort their family members and provide any assistance possible including helping them escape to a country that has no extradition agreement with the US."

Someone who saw defendant's Facebook post informed the Sacramento County Sheriff's Department. A detective searched through defendant's public Facebook page and saw photos of him holding firearms. The detective and several other officers then went to defendant's house. They initially observed the house from outside. When

---

[3] This conclusion makes it unnecessary to address two additional assertions of sentencing error raised by defendant in this appeal.

defendant left the house and drove away in his car, the officers conducted a traffic stop. A search of the car uncovered a .40 caliber semi-automatic handgun in the glove compartment. A subsequent search of a storage locker uncovered a shotgun.

Similar posts (tweets) were made by defendant on Twitter on the same day he made the Facebook post. Two days later, after sheriff's deputies showed up at defendant's house, he sent the following six tweets: "Well that went very well yesterday"; "A lot of people got concerned"; "Which is a great thing"; "Nothing better to be respected and feared at the same time"; "Damn it feels good to be a gangsta"; and "Patrick Gallagher is still a bitch tho." In a direct message exchange on Twitter the same day, defendant explained that "cops came to [his] house" because of "a post [he] made on Facebook" that included "harsh critical remarks about [his] high school and a sheriff deputy that used to work there." Defendant added: "I wished ill will against the school and people saw it because I deliberately made to where anyone can see it and someone saw my album I [s]tay [s]trapped 24/7/365 with my guns and thought they were tied together so at least six units responded to my house and if my mom wasn't there I would've grabbed my guns and who knows what would've happened."

Sometime in 2018, defendant pled no contest to three felony offenses and two misdemeanor offenses, including carrying a concealed weapon and carrying a loaded firearm, and was sentenced to a stipulated split sentence of five years and four months with the first four months to be served in custody and the remaining five years on mandatory supervision. (*People v. Nixon* (Sept. 30, 2022, C094767) [nonpub. opn.], rev. granted Dec. 28, 2022, S277219.)

In December 2018, after defendant was released on mandatory supervision, he was pulled over by Officer Scott. Defendant was handcuffed and searched during the traffic stop and then released without citation. According to Officer Scott, defendant was respectful and professional during this interaction, but did ask for his badge number. Defendant later filed a complaint against the officer.

4

Later that month, defendant went to the Elk Grove Police Department's headquarters and used his cell phone to record a video of the outside of the building. He did so from a public sidewalk. Officer Daniel Emerson was advised of defendant's presence and came outside. The officer asked defendant whether there was any reason he was filming the building. Defendant answered: "Cause I'm allowed to." Officer Emerson responded: "Sure, you are allowed to. Do you have any questions about the facility?" Defendant answered: "No, I do – I do have an issue with one of your officers, but I will take that with him personally." Defendant then provided Officer Scott's name and badge number and said he had already filed a complaint. Defendant added that there would "be some problems" if he saw Officer Scott again "[b]ecause it's personal." Officer Emerson then confirmed with defendant that he was on probation for "[g]un charges" and conducted a pat down search for weapons. After a short conversation about the department's process for handling complaints filed against officers, defendant said that if he saw Officer Scott again, he would "whoop his ass." Officer Emerson advised defendant that he was "already goin' through the appropriate steps" of filing a complaint against Officer Scott, but added, "probably what you shouldn't be doing is coming out to the police department and – and making threats against the officer if you see him again, okay?" Officer Emerson then told defendant he could continue videotaping, "it's a public place," but again warned defendant not to threaten any officers. Defendant said he understood, and the encounter ended amicably.

Not long after this incident, Officer Emerson called Officer Scott and asked him whether he knew someone named Brandon Nixon. Officer Scott said he did. Officer Emerson then said: "Well, he was just at . . . the police department saying he was going to whoop your ass and asking where you were." Around the same time, Detective Anthony Fox was asked to investigate defendant as a possible security risk. The detective found defendant's Facebook page and looked at it periodically during the next several months.

5

On February 21, 2019, defendant was again using his cell phone to record a video on the sidewalk outside the police department headquarters. This time, defendant was contacted by a different officer, who asked whether he needed anything. Defendant said he did not, and the officer left.

On March 14, 2019, defendant returned to again record video outside the police department headquarters. A patrol supervisor monitored defendant's activity for a few minutes, but did not make contact because he "didn't feel that there was any need for confrontation with him."

On March 22, 2019, defendant was again recording video outside the building. The same officer who contacted him on February 21 again made contact with defendant and asked whether he needed anything. This time, the officer was aware that defendant was on probation for possession of weapons and conducted a probation search. After the search, the officer left defendant to his filming.

On April 9, 2019, defendant returned to record more video. This time he was contacted by Officers Daniel Coleman and four other officers. Officer Coleman was aware that defendant had been out there recording video on several prior occasions. He also knew defendant was on searchable probation. When the officers approached defendant, Officer Coleman asked: "Can we help you, Mr. Nixon?" Defendant answered: "Nope. You cannot." Officer Coleman then detained defendant and began conducting a probation search, prompting defendant to say: "Well, you know, now I'll be filing a police complaint against you guys." Defendant, Officer Coleman, and another officer, Officer Schmidt, then argued about the legality of the search and whether the police were harassing defendant or vice versa. The argument became more and more heated as it went on.

At the conclusion of the search, Officer Coleman told defendant not to grab for anything until instructed to do so. Defendant responded: "Fuck off." Officer Coleman told defendant that he would be going to jail for obstruction if he did not listen, to which

6

defendant replied: "Obstruction my ass, bitch." Officer Coleman then told defendant to take his things and leave. Defendant responded: "It's public property dipshit." After Officer Coleman told defendant to leave three more times and told him he was causing a disturbance, defendant responded: "I can cause a disturbance, mother fucker. You haven't seen shit yet bitch." At this point, one of the officers said, apparently to the other officers: "Okay, let's go." Defendant continued: "Fuck you, fuckin' your wife, fuck your kids, fuck all you mother fuckers. I hope you all get killed in the line of duty bitch."

Defendant live streamed this encounter on his Facebook account. He also posted: "Fuck the bitch-ass Elk Grove PD. Ya'll mothafuckas done messed with the wrong [n-word]. To those five pigs who harassed me today, just know, payback's a [n-word], and ya'll gonna get yours."

On July 19, 2019, defendant made the Facebook post that would form the basis of his criminal threats conviction. Defendant posted a picture of Officer Scott, Officer Schmidt, and a third officer. Crosshairs are superimposed over the faces of Officers Scott and Schmidt. The picture is accompanied by the words: "Fuck both of these bitch ass cops and the Elk Grove Police Department. I hope both of you scum bags are killed in the line of duty and your family members are BRUTALLY murdered."

Detective Fox discovered this post four days later during a routine check of defendant's Facebook account and believed it was a direct threat against the lives of Officers Scott and Schmidt. He also discovered the live stream of the April 2019 encounter. The detective further found another post that included a picture of Officer Coleman and one of the other officers involved in that encounter. Crosshairs are superimposed over Officer Coleman's face. This post was accompanied by the words: "I don't give a fuck like Tupac. I get a fucking thrill when I see a cop drop."

Defendant's Facebook account was titled, "Ballitically Correct." The use of crosshairs over the faces of people defendant despised was a common motif of defendant's posts. We need not describe these other posts in any detail. It will suffice to

7

note that they included two Sacramento County Superior Court judges and the former Sacramento County Sheriff.

The day after Detective Fox made these discoveries, officers contacted defendant at his home. He was detained and the house was searched. Additional images with crosshairs over various people's faces were found on defendant's computer. Internet searches on defendant's cell phone indicated he was seeking information regarding the legality of probation searches and the locations of ammunition checkpoints.

Officers also found an essay on defendant's phone titled, "Guns & Violence: An Addiction That Nearly Killed Me," chronicling defendant's childhood obsession with violent video games and claiming that "bullying and hazing" in high school caused him to make death threats "as a deterrent which only backfired." Defendant also explained that this bullying later caused him to buy guns and ammunition and make a "hit list of all the people [he] wanted to kill from school and the military." Defendant added: "I was even so hell bent on harming those who harmed me I purchased rifle ammunition and wrote the names of those individuals on the bullets that I had." The essay then describes the incident arising out of the 2017 Facebook post, ultimately resulting in "five convictions on [his] record" and subsequent difficulty finding employment. Defendant further noted that he had many dreams of murdering "people who had wronged [him] in the past . . . [b]lowing their heads off and brains out riddling their bodies with bullets," and that he used to believe that carrying a handgun was an "honorable and mandatory thing to be a gangsta." Defendant concluded the essay by explaining that "all [he] can do is learn from these mistakes" and share his story with others "so they can understand that guns and violence are both debilitating addictions that have real life consequences."

Officers further searched defendant's Instagram account and found a conversation from July 8, 2019, a week and a half before he made the Facebook post at issue in this case, in which defendant told another Instagram user that he had "posted a threat against police." This comment appears to be referring to an earlier version of the Facebook post,

8

dated June 27, 2019, which stated: "Fuck the bitch-ass, hashtag, Elk Grove Police Department and Patrick Scott, badge 261, left, and the cop I haven't been able to identify yet in the middle."

On July 31, 2019, a week after defendant's home was searched, Detective Fox showed Officer Scott the Facebook post. Officer Scott "took [the post] to mean that [defendant] wanted to kill [him] and Officer Schmidt and that he hopes our family members are murdered." Officer Scott took the post to be a serious threat because: (1) he knew defendant had come to the police department on a prior occasion and said he wanted to "whoop my ass," (2) he knew defendant was on probation for a firearm-related offense, (3) he was also told that a sheriff's deputy had contacted the police department and said defendant "threatened the . . . deputy in the past, and to take him seriously," and (4) he further knew that deputy was investigating "something about threats about shooting up Cosumnes Oaks High School." All of this caused Officer Scott to experience sustained fear for his life.

Based on the foregoing, as well as evidence of prior threats defendant made against a superior officer while serving in the Army Reserve, defendant was convicted of one count of making a criminal threat and sentenced to serve three years in state prison.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support his criminal threats conviction because there was no evidence that he intended for Officer Scott to see the Facebook post and, as a matter of law, the words used in the post did not constitute a threat as defined by section 422. We disagree.

A.  *Legal Principles and Standard of Review*

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to

9

determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

In order to prove the offense of making criminal threats under section 422, "[t]he prosecution must prove '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat — which may be "made verbally, in writing, or by means of an electronic communication device" — was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' [Citations.]" (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*).)

In addition to assessing the sufficiency of the evidence to support the foregoing elements, "a reviewing court should make an independent examination of the record in a section 422 case when a defendant raises a plausible First Amendment defense to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat." (*George T., supra*, 33 Cal.4th at p. 632.) As our Supreme Court has explained, the First Amendment permits punishment of a threat "only if 'on its face and in the circumstances in which it is made [it] is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution . . . .' " (*People v. Mirmirani* (1981) 30 Cal.3d 375, 388, fn. 10, quoting from *United States v. Kelner* (2d Cir. 1976) 534 F.2d 1020, 1027.)

The current version of section 422 incorporates this constitutional standard as an element of the offense. (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 861 (*Ryan D.*).) Thus, we must independently determine whether this element is satisfied. However, "[i]ndependent review is not the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different. [Citation.] Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue. [Citations.] As noted above, under the substantial evidence standard, the question is whether any rational trier of fact could find the legal elements satisfied beyond a reasonable doubt, whereas under independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." (*George T., supra*, 33 Cal.4th at p. 634.)

With these principles of appellate review in mind, we now address defendant's specific arguments challenging his criminal threats conviction.

B.    *Defendant's Intent for Officer Scott to View the Post*

Defendant first argues there was no evidence he intended Officer Scott to view his Facebook post.  He is mistaken.

As we explained in *Ryan D., supra*, 100 Cal.App.4th 854, although section 422 "does not require that a threat be personally communicated to the victim by the person who makes the threat," the statute " 'targets only those who try to instill fear in others.' [Citation.]  In other words, section 422 does not punish such things as 'mere angry utterances or ranting soliloquies, however violent.' [Citation.]  Accordingly, where the accused did not personally communicate a threat to the victim, it must be shown that he specifically intended that the threat be conveyed to the victim." (*Ryan D.,* at p. 861.)

Here, the evidence is more than sufficient to satisfy this requirement.  First, defendant's Facebook account was public, which means that anyone could go to his page and see the post in question.  That defendant knew this to be the case is evidenced by the fact that when he made the May 2017 post about Cosumnes Oaks High School and Deputy Gallagher, someone saw the post and informed the sheriff's department, and sheriff's deputies thereafter stopped defendant and searched him and his house.  Two days later, in a message exchange on Twitter, defendant admitted the deputies did so because he "deliberately made to where anyone can see" his Facebook posts.  He also surmised that their level of concern was heightened because, as he put it, "I [s]tay [s]trapped 24/7/365 with my guns," and photos of him carrying those guns were also prominently displayed on his Facebook page.  Thus, defendant's own comments establish he knew law enforcement could view his Facebook page.[4]

---

[4]    Additionally, after defendant's house was searched in July 2019, defendant made his Facebook account private, further indicating that he understood the difference between a public and private account.

12

Second, after defendant was pulled over by Officer Scott in December 2018, he went to the Elk Grove Police Department headquarters and told Officer Emerson that he had a "personal" problem with Officer Scott, and if he ever saw him again, he would "whoop his ass." Defendant also admitted to Officer Emerson during the interaction that he was on probation for gun-related offenses. Although there is no evidence that defendant knew Officer Emerson conveyed defendant's message to Officer Scott, this interaction at the police station gave law enforcement reason to periodically monitor defendant's Facebook account. Based on defendant's previous experience after making the Cosumnes Oaks High School post, a jury could have reasonably concluded defendant would have known the Elk Grove Police Department was now part of his Facebook audience.

Third, defendant returned to the police station at least four more times in the next four months in what can best be described as a campaign of seeking out conflict with the police. The last of these interactions, in April 2019, between defendant and police officers became quite heated, culminating in defendant saying: "Fuck you, fuckin' your wife, fuck your kids, fuck all you mother fuckers. I hope you all get killed in the line of duty." We need not determine whether this is a criminal threat. We do note, however, that even if the police were not already monitoring defendant's Facebook page, each of these interactions gave police more of a reason to do so. Defendant would have known this as well. Indeed, his engagement in these activities strongly suggests that he not only intended to place himself on law enforcement's radar, but was going out of his way to hold their attention and highlight himself as an ongoing potential danger to the department and its officers.

Finally, the Facebook post forming the basis for defendant's criminal threats conviction was posted in July 2019. It depicted both Officer Scott and Officer Schmidt, who was involved in the April 2019 interaction at the police station. Both officers had crosshairs superimposed over their faces, along with the words: "Fuck both of these

13

bitch ass cops and the Elk Grove Police Department. I hope both of you scum bags are killed in the line of duty and your family members are BRUTALLY murdered." We discuss the status of this post as a criminal threat and not protected speech in the next section of this opinion. For now, we conclude, based on defendant's full engagement in conflict with the police, his previous experience with law enforcement monitoring his Facebook page, his status as a probationer on mandatory supervision following two felony gun-related offenses, his threat to assault Officer Scott during his initial appearance at the police station, and the escalating nature of his subsequent appearances at the police station, that the evidence strongly supports the conclusion that defendant knew law enforcement was likely to be monitoring his Facebook page when he posted the content at issue in this case. From this follows a reasonable inference that defendant intended the post to be viewed by Officers Scott and Schmidt.

Nevertheless, defendant relies on *Ryan D., supra*, 100 Cal.App.4th 854, and *People v. Roles* (2020) 44 Cal.App.5th 935 (*Roles*) in arguing the evidence is insufficient to show he intended the Facebook post to be shown to Officer Scott. These cases are readily distinguishable. In *Ryan D.*, a minor painted a picture of himself shooting a police officer assigned to his high school. He then turned the painting in to his art teacher for credit. The officer depicted in the painting had cited the minor for possession of marijuana about a month earlier. Alarmed by the image, the teacher took it to a school administrator. The officer was shown the painting the next day. (*Ryan D.,* at p. 858.) Concluding the evidence was insufficient to support a finding that the minor intended for the officer to see the painting, we explained: "It is true the minor conceded it was reasonable to expect that [the officer] eventually would see the minor's painting. However, this concession was made at the urging of an assistant principal near the end of a 40-minute interview in which the minor stated that he did not think [the officer] would ever see the painting. In light of all the evidence, the concession is insufficient to support the juvenile court's finding that the minor *intended* [the officer] to see the painting. After

14

all, he did not display it to [the officer] or put it in a location where he knew she would see it. Nor did he communicate with [the officer] in any manner to advise her that she should see the painting. Even [the officer] acknowledged that the students would not expect her to come into the art classroom. In fact, [the officer] did not learn of the painting until an assistant principal called and then showed it to her." (*Id.* at pp. 863-864.)

Thus, a mere reasonably foreseeable possibility that the alleged threat would be conveyed to the person allegedly targeted is not sufficient. But that is not all there is in this case. As we have explained, defendant knew that the Sacramento County Sheriff's Department had looked at his Facebook page in 2017. Indeed, he expressed delight in their response to his Cosumnes Oaks High School post, saying: "Nothing better to be respected and feared at the same time." He later threatened to "whoop [Officer Scott's] ass" when talking to Officer Emerson outside the Elk Grove Police Department headquarters, causing that department to start monitoring defendant's Facebook account to assess whether he presented a security risk. He then returned to the station, over and over again, telling several officers during the April 2019 visit that he hoped they were killed in the line of duty. At that point, the prospect of law enforcement viewing his Facebook page was a near certainty, not merely a reasonably foreseeable possibility. To be sure, no one directly and expressly informed defendant that they were doing so. But nothing in *Ryan D.* requires absolute certainty that the message would be seen by Officer Scott. What is required is enough evidence to support a reasonable conclusion that defendant intended Officer Scott to see the post. That standard is met.

Defendant's reliance on *Roles, supra*, 44 Cal.App.5th 935 is also misplaced. There, during a contentious custody dispute, the defendant left a series of voicemails for the attorney representing the child, many of which threatened that attorney's life and the life of the wife's attorney. (*Id.* at p. 940.) He was convicted of nine counts of making criminal threats against the child's attorney and one count of making a criminal threat

against the wife's attorney. (*Id*. at p. 938.) With respect to the latter count, we concluded the evidence was insufficient to establish the defendant intended the child's attorney to communicate the contents of the voicemails to the wife's attorney. (*Id*. at p. 944.) It was not enough, we explained, that the defendant was present in court when the two attorneys had previously shared the defendant's communications with the court, or that one of the attorneys testified that she believed the defendant was also aware that they shared his communications with each other. (*Ibid*.) In other words, even if the defendant knew these things, there was no evidence that he intended for the child's attorney to act as intermediary in delivering a threat to the wife's attorney. As we explained, the wife's attorney "acknowledged defendant had her phone number and contacted her personally several times in a threatening manner, indicating he generally communicated with [her] directly and not through [the child's attorney]." (*Ibid*.)

Here, unlike *Roles*, there is no evidence that defendant had a ready means of directly threatening Officer Scott, thereby undermining a conclusion that he intended the Facebook post to do so. On the contrary, the evidence suggests that defendant intended to directly threaten to assault Officer Scott during his first visit to the police station, but Officer Scott was not there. Undeterred, defendant kept coming to the station. And his animosity towards law enforcement escalated after the April 2019 encounter. As we have explained, defendant had every reason to know police were monitoring his Facebook page by the time he made the post depicting Officer Scott and Officer Schmidt with crosshairs over their faces. We conclude the evidence is sufficient to support a finding that he intended the officers to see it.

In sum, viewed in context, a jury could have reasonably concluded the Facebook post was not merely a violent rant that defendant had no intention of being communicated to Officer Scott, but was instead posted with the specific intent that Officer Scott see it and be placed in fear. (See *People v. Felix* (2001) 92 Cal.App.4th 905, 913 [section 422 "was not enacted to punish emotional outbursts, it targets only those who try to instill fear

16

in others"]; *People v. Teal* (1998) 61 Cal.App.4th 277, 281 [the section does not punish "mere angry utterances or ranting soliloquies, however violent"].)

C.     *Status of the Facebook Post as a Threat and not Protected Speech*

Defendant also argues the words used in the Facebook post did not constitute a threat as defined by section 422. We disagree.

"The language of . . . section 422 requires the threat to be '*so* unequivocal, unconditional, immediate, and specific *as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat . . . .*' (Italics added.) The statute punishes those threats which convey to the victim a gravity of purpose and an immediate prospect of execution. The use of the word 'so' indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim. The four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim." (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1157-1158.)

As previously stated, this element is also the constitutional dividing line between true threats and protected speech under the First Amendment. (See *People v. Mirmirani, supra*, 30 Cal.3d at p. 388, fn. 10; *Ryan D., supra*, 100 Cal.App.4th at p. 861.) We must therefore independently determine whether this element is satisfied. (*George T., supra*, 33 Cal.4th at p. 632.)

We begin by acknowledging that were we to view the Facebook post in isolation, we might agree with defendant's position. It depicted Officers Scott and Schmidt with crosshairs superimposed over their faces, along with the words: "Fuck both of these bitch ass cops and the Elk Grove Police Department. I hope both of you scum bags are killed in the line of duty and your family members are BRUTALLY murdered." Standing alone, the crosshairs imagery is ambiguous. Detective Fox testified that he

interpreted it to mean that defendant was the one viewing these officers through the scope of a rifle, "aiming at" and "trying to shoot" them. Officer Scott viewed the crosshairs similarly. While we certainly agree the crosshair imagery unambiguously conveys defendant's wish for these officers to be targets of violence, it does not necessarily mean that he was personally threatening to shoot them. Indeed, it is at least arguable that defendant's intent with respect to use of the crosshairs is significantly clarified by the accompanying words. Defendant said he *hoped* Officers Scott and Schmidt would be killed in the line of duty and their family members brutally murdered, not that he would be the one to do so. But we do not view the Facebook post in isolation. (See *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218 ["the meaning of the threat . . . must be gleaned from the words and all of the surrounding circumstances"].)

The parties have not pointed us to any California cases with remotely similar facts; nor have we uncovered any on our own. However, we find an Illinois decision, *People v. Bona* (Ill. Ct.App. 2018) 118 N.E.3d 1272 (*Bona*), to be instructive on this issue. The defendant in that case left a voicemail for an Illinois lawmaker saying: " 'Your Tea Party brethren, Sara[h] Palin, put up a map that included the names, locations, faces of Democratic candidates, and put them in the cross-hairs of a gun. Perhaps we should do the same for you. We know where you live. There is no longer an assault weapons ban. Perhaps you should think about that before you speak the next time, you stupid fucking bitch.' " (*Id.* at p. 1288.) The voicemail was apparently prompted by certain statements the lawmaker made in a radio interview, as well as earlier statements she made in two newspaper articles. (*Id.* at pp. 1286-1287.) Rejecting the argument that this was not an unconditional threat to harm the lawmaker, but rather "a conditional threat to create a website" (*id.* at p. 1286), the Illinois court explained that the voicemail was left "well after business hours," the defendant "used the term 'we' when referring to himself, which suggested that he was part of a larger collective," the voicemail "was a calculated statement that came days after the radio interview" rather than "an angry and excited

18

utterance," and the defendant was aware that "within a few months after Sarah Palin posted that map, one of those legislators, Congresswoman Gabby Giffords of Arizona, was shot in the head." (*Id*. at p. 1287.) The court explained that a reasonable inference from the defendant's knowledge of the shooting was that "he meant to communicate that a similar event might befall [the lawmaker]." (*Ibid*.) Finally, the court relied on the "menacing" nature of the voicemail, in contrast to the defendant's less menacing description of it in his statement to police, supporting a reasonable inference "that he understood that what he said was threatening and, when faced with a police investigation, he attempted to mitigate the content of his message." (*Id*. at p. 1288.)

Thus, any ambiguity in the voicemail left for the lawmaker in *Bona* was sufficiently clarified by the menacing nature of the voicemail, the timing of its delivery, and the mention of the crosshairs imagery on Sarah Palin's website with the knowledge that Congresswoman Giffords was shot a few months later.

Similarly, here, while the Facebook post is somewhat ambiguous on its face, viewed in light of the surrounding circumstances, it is sufficiently unequivocal, unconditional, immediate, and specific to have conveyed to Officer Scott a gravity of purpose and an immediate prospect of execution. Defendant used the same crosshairs imagery, placing them over the faces of Officers Scott and Schmidt, and the accompanying words clarified he wanted both men targeted for violence, and for them and their families, to die. Defendant himself, apparently referring to an earlier version of this post, specifically called it "a threat against police." However, even if defendant was talking about a different post, this comment at the very least admits a general intent to threaten the police. And as we have already explained, defendant must have known that law enforcement would almost certainly be monitoring his Facebook page at the time he made the post, and a reasonable inference follows that he intended for the officers to view the post. Statements he made following the earlier Cosumnes Oaks High School post also support a reasonable inference that defendant not only intended them to view it, but

19

also wanted to instill fear in the officers. With respect to Officer Scott specifically, several months before making the post, defendant came to the police station and threatened to physically assault the officer. Defendant was on mandatory supervision at the time, following two felony convictions for firearm offenses. Defendant then returned to the police station several times during the intervening months, seeking out conflict with officers. The last of these visits ended with threatening remarks made by defendant to the officers who detained him and performed a probation search, including Officer Schmidt. The Facebook post was made three months after this incident, and about seven months after defendant threatened to physically assault Officer Scott. Thus, as in *Bona*, this is not a situation in which defendant made an angry and excited utterance immediately after a provoking event. Defendant's post was a calculated statement, made months later. While not absolutely unequivocal, unconditional, immediate, and specific, it was sufficiently so to qualify as a true threat.

Nor are we persuaded by defendant's reliance on *George T., supra*, 33 Cal.4th 620, or *Ryan D., supra*, 100 Cal.App.4th 854. Both of these cases involved alleged threats made by minors. In *Ryan D.*, it was the painting described earlier in this opinion. In *George T.*, it was " 'dark poetry' " (*George T.,* at p. 628) indicating that the minor had "the potential or capacity to kill students given his dark and hidden feelings." (*Id*. at p. 636.) In neither case was the alleged threat sufficiently unequivocal, whether viewed in isolation or in context, to satisfy the constitutional standard. (*Id*. at pp. 637-638; *Ryan D.,* at pp. 864-865.) For reasons already expressed, the context in this case is very different.

We conclude defendant's criminal threats conviction is supported by substantial evidence and does not amount to an infringement of defendant's First Amendment right to free speech.

II

*Admission of Evidence of Prior Threats*

Defendant also claims the trial court prejudicially abused its discretion and violated his federal constitutional rights by admitting evidence of prior threats. Not so.

A.     *Additional Background*

Over defendant's objection, the trial court admitted testimony from F.L., who was defendant's squad leader in the Army Reserve in 2013. She testified that defendant told her that he wanted to commit a shooting at his high school. F.L. warned him about making these statements, but he continued to do so, causing her to report him to her immediate superior officer, who in turn reported the statements to the platoon sergeant. Sometime later, defendant started sending F.L. text messages threatening to kill her and her family. She received 30 or 40 such messages, many of which stated that defendant wanted to shoot her. One of these messages was received while F.L. was on her college campus. It also described what she was wearing that day, causing F.L. to become more alarmed and report the threats to her superior officers. They took the threats seriously enough to keep defendant and F.L. separated during gun training.

The trial court admitted this testimony under Evidence Code section 1101, subdivision (b), explaining that it was relevant to prove defendant's intent to threaten Officer Scott. The trial court also concluded the probative value of this evidence was not substantially outweighed by any of the statutory counterweights found in Evidence Code section 352.

B.     *Analysis*

With certain exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Subdivision (b) of this section provides: "Nothing in this section prohibits the admission of evidence that a

person committed a crime, civil wrong, or other act when relevant to prove some fact (such as . . . intent . . .) other than his or her disposition to commit such an act." (*Id.*, subd. (b).)

As stated previously, the crime of making a criminal threat requires proof that the person making the threat had "the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out . . . ." (§ 422, subd. (a).) The prior threats defendant made against F.L.'s life, and the lives of her family members, were relevant to prove he possessed a similar intent when he made the Facebook post at issue in this case. Indeed, "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402; see, *People v. Orloff* (2016) 2 Cal.App.5th 947, 956-957 [prior uncharged threats against other persons properly admitted as probative of whether the defendant had the requisite intent in making the charged threats].)

Defendant does not argue otherwise. Instead, he claims it "had little relevance" and "was simply not very probative," and therefore should have been excluded under Evidence Code section 352. This section provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) This provision "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but also "requires that the danger of these evils substantially outweigh the probative value of the evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; *People v. Tran* (2011) 51 Cal.4th 1040, 1047.) "Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its

22

discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168 (*Holford*).)

We conclude there was no abuse of discretion. Contrary to defendant's argument on appeal, the challenged evidence was not "cumulative to the other evidence that the prosecution used to prove the same issue." As the trial court explained, referring to all of the evidence admitted proving defendant made a criminal threat, "it might appear to be cumulative on its face, but it's actually not. When you look at it, it's a stream of conduct over a relatively short period of time in succession, excepting [F.L.], one after the next, after the next. What it actually does is it's not as much cumulative as it's simply linear, telling the story from the People's view of what happened . . . ." We agree with this assessment. The prior threats made against F.L. and her family was not cumulative of the other evidence admitted against defendant in this case. That other evidence served to place defendant's Facebook post in its proper context. The evidence of the prior threats made against F.L. and her family was outside of that linear succession, but was nevertheless highly probative of defendant's intent to threaten Officer Scott.

Nor was the probative value of these prior threats significantly diminished by the passage of time. They occurred in 2013, about six years before defendant made the Facebook post threatening Officer Scott. This is not remote conduct. (See *People v. Gutierrez* (1993) 14 Cal.App.4th 1425, 1435.) Moreover, in the meantime, defendant continued making threatening comments to and about people with whom he had issues. The question of remoteness for purposes of Evidence Code sections 352 and 1101, subdivision (b) is "whether the prior conduct is so old that it is not reasonable to conclude it speaks to a person's current mental state." (*People v. Williams* (2018) 23 Cal.App.5th 396, 422, fn. 9.) Defendant's intervening conduct bolsters the conclusion that defendant likely harbored the same intent when he threatened F.L. and her family as he did when he made the Facebook post in this case.

23

Thus, while undeniably damaging to defendant's prospect of acquittal, the challenged evidence was highly probative of defendant's intent to threaten Officer Scott and his family. (*People v. Orloff, supra*, 2 Cal.App.5th at pp. 956-957.) "This court has noted that ' "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.' " [Citations.]' [Citation.]" (*Holford, supra*, 203 Cal.App.4th at p. 167.) The trial court did not abuse its discretion in concluding the probative value of the challenged evidence was not substantially outweighed by the danger of undue prejudice.

Nor was that probative value substantially outweighed by the other statutory counterweights, i.e., necessitating an undue consumption of time or creating a substantial danger of confusing the issues or misleading the jury. (Evid. Code, § 352.) Defendant's opening brief on appeal does not argue otherwise. Any contention to the contrary now is therefore forfeited. (See *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 ["an appellant's failure to discuss an issue in its opening brief forfeits the issue on appeal"]; see also *People v. Stanley, supra*, 10 Cal.4th at p. 793.)

Finally, "[h]aving concluded that the trial court did not abuse its discretion under [Evidence Code] section 352, we must also reject defendant's argument that he was deprived of his constitutional right to a fair trial. ' "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." ' [Citation.]" (*Holford, supra*, 203 Cal.App.4th at p. 180.) The challenged evidence does not come close to this level of prejudice.

## III

### Failure to Instruct on Causation

Defendant further asserts the trial court prejudicially erred and also violated his constitutional rights by failing to instruct the jury with CALCRIM No. 240 on causation. He is mistaken.

As stated previously, the crime of making a criminal threat requires proof that the threat "causes [the recipient] reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . ." (§ 422, subd. (a).) However, a trial court has a duty to instruct on causation *only* when causation is at issue. (*People v. Bell* (2020) 48 Cal.App.5th 1, 17; *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 591.)

Defendant argues, "[t]here was considerable controversy about what caused [Officer] Scott's fear," citing the officer's testimony concerning what he knew and believed about defendant and his conduct prior to making the Facebook post. According to defendant, because there was more than one cause of Officer Scott's fear, the trial court had a sua sponte duty to instruct the jury that the Facebook post itself must have been "a substantial factor in causing" the officer's fear, as opposed to "a trivial or remote factor." (CALCRIM No. 240.) In response, the Attorney General argues, "the defense theory presented at trial was that the Facebook post did not cause Officer Scott to be in fear, that is, [the officer] was not in fear at all, not that there were *other* causes of [the officer's] fear." Thus, according to the Attorney General, "there was no controversy presented concerning other possible causes of [Officer] Scott's fear," and therefore, the trial court had no sua sponte duty to provide CALCRIM No. 240. The Attorney General has the better argument.

In any event, even assuming the trial court erred in failing to instruct the jury with CALCRIM No. 240, any assumed error would be manifestly harmless under any standard of prejudice. Employing the most stringent standard, we conclude beyond a reasonable doubt that the failure to provide CALCRIM No. 240 did not contribute to the verdict.

25

(See *People v. Flood* (1998) 18 Cal.4th 470, 504.) First, the jury was instructed that causation was required, specifically that the threat had to cause sustained fear. The alleged threat was the Facebook post. Second, defendant does not take issue with the jury's conclusion that Officer Scott was placed in such fear, but rather complains that the jury should have been further instructed that the Facebook post had to be a substantial factor in bringing about the fear, rather than a trivial or remote factor. However, the other claimed "causes" of Officer Scott's fear were things the officer was told about defendant, such as the fact that he made the 2017 Cosumnes Oaks High School Facebook post, was on probation for gun charges, and threatened to assault him the first time he came to the police station. The jury was entitled to take these surrounding circumstances into consideration in determining whether the Facebook post placed Officer Scott in sustained fear. To be sure, some of what the officer believed about defendant was not entirely accurate, for example, his testimony suggested that he believed defendant threatened to carry out a school shooting, when the actual Cosumnes Oaks High School Facebook post did not go that far. But the claimed instructional error did not somehow prevent the jury from being able to assess what was true and what was not. Nor is it dispositive that Officer Scott testified that the Facebook post *alone* would have caused him "a little bit of fear." Again, the jury was not required to determine whether the Facebook post would have been sufficient, in isolation, to place Officer Scott in sustained fear. The jury was entitled to take the surrounding circumstances into account. CALCRIM No. 240 would not have informed the jury otherwise.

For all of these reasons, any assumed instructional error was harmless beyond a reasonable doubt.

IV

*Cumulative Prejudice*

Having found no error, prejudicial or otherwise, we must also reject defendant's assertion of cumulative prejudice.

26

V

*Retroactive Application of Senate Bill 567*

Finally, defendant contends Senate Bill No. 567 (Stats. 2021, ch. 731) (Senate Bill 567) applies retroactively to his case and requires remand for a new sentencing hearing. The Attorney General concedes the issue. We accept the concession and remand the matter for a new sentencing hearing.[5]

On October 8, 2021, the Governor signed Senate Bill 567 into law. This enactment became effective January 1, 2022 (Cal. Const., art. IV, § 8, subd. (c)), about five months after defendant was sentenced to an upper term sentence of three years for his criminal threats conviction.

As relevant here, Senate Bill 567 limits the trial court's ability to impose an upper term determinate sentence by making the middle term the presumptive prison term unless specified circumstances exist. (§ 1170, subd. (b)(1)-(2).) A trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, *and the facts underlying those circumstances have been stipulated to by the*

---

[5]  Defendant additionally contends he is entitled to dual custody credits and the abstract of judgment must be corrected. Because the Attorney General concedes remand is required, the respondent's brief does not address these additional issues and instead notes that defendant "may argue these points in the trial court at the new sentencing hearing." We agree with the Attorney General. With respect to defendant's request that we order correction of the abstract of judgment, a new abstract of judgment will be generated following defendant's resentencing; it would therefore make no sense to order correction of the current abstract. With respect to the custody credit issue, we also note that the argument defendant makes on appeal was not made before the trial court. He has therefore forfeited the ability to raise the issue in this appeal. (See *People v. Myers* (1999) 69 Cal.App.4th 305, 311-312.) Defendant may, as the Attorney General concedes, make the argument on remand.

*defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.*"  (§ 1170, subd. (b)(2), italics added.)

As the Attorney General properly concedes, this amended version of section 1170, subdivision (b) applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal.  (See *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1108-1109.)  The Attorney General also concedes "[n]one of the aggravating factors the trial court cited in imposing the upper-term sentence . . . were either admitted by [defendant] or found to be true beyond a reasonable doubt."  The Attorney General further concedes that the error is not harmless under the test we set forth in *Zabelle*.  We accept these concessions as well.  We must therefore vacate defendant's sentence and remand the matter for a new sentencing hearing.

## DISPOSITION

The sentence is vacated, and the matter is remanded to the trial court to resentence defendant under the current version of section 1170.  In all other respects, the judgment is affirmed.

_____\s\_____,
McADAM, J.*

We concur:

_____\s\_____,
DUARTE, Acting P. J.

_____\s\_____,
KRAUSE, J.

---

\*     Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.